J-S34043-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: J.R.R., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: ALLEGHENY COUNTY | : | |
| OFFICE OF CHILDREN, YOUTH AND | : | |
| FAMILIES | : | No. 206 WDA 2018 |

Appeal from the Order January 10, 2018
in the Court of Common Pleas of Allegheny County
Orphans' Court at No(s):  CP-02-AP-0000055-2016

| | | |
|---|---|---|
| IN RE: A.R.R., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: ALLEGHENY COUNTY | : | |
| OFFICE OF CHILDREN, YOUTH AND | : | |
| FAMILIES | : | No. 207 WDA 2018 |

Appeal from the Order Entered January 10, 2018
in the Court of Common Pleas of Allegheny County
Orphans' Court at No(s):  CP-02-AP-0000057-2016

BEFORE:   BOWES, STABILE, and STRASSBURGER[*], JJ.

MEMORANDUM BY STRASSBURGER, J.:           **FILED JULY 16, 2018**

Allegheny County Office of Children, Youth and Families (CYF) appeals from the orders entered January 10, 2018, in the Court of Common Pleas of Allegheny County, which denied its petitions to terminate involuntarily the parental rights of T.A.R. (Mother) and T.R.R. (Father) (collectively, Parents) to their children, J.R.R. (born in August 2002) and A.R.R. (born in November 2007) (collectively, Children).[1]  We affirm.

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] CYF had also filed a petition to terminate Parents' parental rights to a third child, C.R. (born in June 2004).  The orphans' court granted CYF's petition on

We offer the following summary of the factual and procedural history of this case. In 2004, prior to CYF's involvement, and at the recommendation of Children's[2] pediatrician, Parents sought services to assist them with J.R.R. and C.R. due to their suffering developmental delays. Services continued through A.R.R.'s birth in 2007, and remained in place until 2008. In 2008, "CYF became involved with the family after receiving a [Childline[3]] report that J.R.[R.], age five at the time, had appeared at school with bite marks and scratches and stated that C.R., his younger brother, had caused them." Orphans' Court Opinion, 3/28/2018, at 3. CYF investigated, but did not accept the family for services, because they were already receiving numerous services from various providers.

In September 2008, CYF received two additional Childline reports, regarding Father injuring C.R. and C.R. injuring J.R.R. Additionally, CYF learned that Father was physically abusive toward Mother. "A CYF visit to the home revealed excessive clutter and indication that the family suffered from a tendency to hoard possessions." *Id*. In November 2008, CYF accepted the

---

November 8, 2017, and Parents filed a notice of appeal to this Court. This Court affirmed the order terminating Parents' parental rights to C.R. on May 21, 2018.

[2] At this point, only J.R.R. and C.R. had been born.

[3] "Childline is part of [a] mandated state wide protective services program which accepts child abuse [reports] and general well-being concerns." CYF's Brief at 7 n.3.

family for services based upon the Childline reports and Father's actions. CYF instituted a family safety plan and provided services to address the issues with excessive clutter.[4] By April 2009, Children were still being injured by each other, Parents were not adequately supervising Children, and C.R. was increasingly violent with J.R.R. and Mother.

On August 7, 2009, J.R.R. was admitted to Latrobe Hospital after he tried to jump out of a window. In addition, J.R.R. was becoming increasingly aggressive toward his family and there were incidents of him urinating on the floor. He stayed in Latrobe Hospital until returning home on August 12, 2009. On June 19, 2010, CYF removed J.R.R. from Parents' care, and he was admitted to the Western Psychiatric Institute and Clinic (WPIC) due to displays of increased aggression. He was then transferred to

> Residential Enhancement Services, Planning Opportunities for New Directions (RESPOND), a mental health facility for intensive treatment of children with mental health disorders who have not succeeded at other facilities. He remained at RESPOND to receive therapeutic residential care from July 22, 2010 to October 14, 2011[,] when he returned to [P]arents' home, although he continued to receive services of the RESPOND program Mobile Treatment Team following his discharge.

*Id*. at 6.

"On February 15, 2012, [C]hildren were adjudicated dependent on grounds that they suffered from a lack of supervision and because Parents

___

[4] Those services continued until 2009 and then were discontinued when the providers reported that Parents were making only minimal progress toward resolving the issues with clutter.

displayed a lack of improvement in their ability to parent [C]hildren despite the provision of various services to aid them." *Id*. at 4. J.R.R. was removed from Parents' home at his own request. A.R.R. was removed from Parents' care after she was found unattended, and there were reports of violence between her and her brothers. With respect to J.R.R., CYF placed him at

> Auberle Shelter until August 3, 2012. He then moved into a foster home until December 20, 2013, when he returned to [P]arents. J.R.[R.] remained in the care of [P]arents until April 7, 2014[,] when he became very aggressive and agitated during a psychological evaluation with Dr. Patricia Pepe, a licensed psychologist, resulting in his admission to WPIC until April 16, 2014. He was then placed with the Mercy Behavioral Health Diversion and Acute Stabilization (DAS) program. [J.R.R. returned home on May 7, 2014.]

*Id*. at 6.

With respect to A.R.R., at the time of dependency, CYF placed her in an Every Child foster home for two days, but she was removed from there after being found wandering unattended. On May 25, 2012, CYF placed A.R.R. with her maternal aunt, where she stayed until November 2012 when her aunt could no longer manage A.R.R.'s behavior. A.R.R. moved to a foster home at that time, where she remained until March 2014, when the foster mother "reported that she could no longer manage Parents' negative involvement." *Id*. at 7. A.R.R. then returned home, where she was living with Parents, J.R.R., and C.R.

On June 9, 2014, A.R.R., reported that she and/or her siblings had showered with Father. Children were again removed from the home.

J.R.[R.] returned to his prior foster home where his behaviors improved until November of 2015 when he became very aggressive towards his foster mother, threatened to harm her grandchild, and displayed suicidal and homicidal ideations. The foster family requested his removal at that time and he was placed at a local hospital and then transported to Southwood Psychiatric Hospital. J.R.[R.] remained at Southwood from November 30, 2015 to December 4, 2015[,] before moving to Family Services of Western PA Diversion and Acute Stabilization (DAS) program at the recommendation of service providers at Southwood who believed that it was therapeutically necessary for him as a step down placement as he would likely not adjust well to a foster home setting at that time. On December 13, 2015, he moved to a Family Links home then to Family Links Pathways until June 21, 2016, and from there to his current foster home.

*Id*. at 6-7.

A.R.[R.] moved to foster care, where foster mother reported that A.R.[R.], age six at the time, was soiling herself, and also that she behaved aggressively, and was hitting her teachers. CYF admitted A.R.[R.] to Southwood Psychiatric Hospital on March 26, 2015 to May 5, 2015[,] after which she returned to foster care until July 22, 2015. However, A.R.[R.]'s aggression continued, and after she threatened to harm herself and others in the home, CYF admitted her to WPIC from July 22, 2015 to November 3, 2015. She then moved to Family Links Pathways from November 2015 to July 2016 and then to RESPOND where she continued to reside at the time of the TPR hearings.

*Id*. at 7-8.

On March 28, 2016, CYF filed petitions to terminate involuntarily the parental rights of Mother and Father as to J.R.R., C.R., and A.R.R. The orphans' court initially conducted termination of parental rights (TPR) hearings on April 8, 2016, July 1, 2016, October 7, 2016, January 13, 2017, and April

21, 2017.[5]  In the meantime, on March 28, 2017, the Pennsylvania Supreme Court decided ***In Re: Adoption of L.B.M.***, 161 A.3d 172 (Pa. 2017) (requiring appointment of counsel to serve child's legal interests).  Accordingly, the orphans' court appointed legal counsel for each child and held *de novo* TPR hearings on the petitions to terminate parental rights on September 8, 2017, September 14, 2017, September 25, 2017 and October 12, 2017.[6]

At those hearings, the orphans' court heard testimony from the following individuals: Jessica Judy (a supervisor from a service provider); Dr. Todd Ryan Hode (program director for the RESPOND program); Leann Rendulic (a CYF caseworker assigned to this family); Wanda Beasley (a CYF caseworker assigned to this family); Tamryn Brown (A.R.R.'s mental health outpatient therapist); and Parents.

In addition, the orphans' court heard testimony from two psychologists, who reached opposite conclusions regarding termination.  This family was initially evaluated by Dr. Patricia Pepe from 2011 to 2014.  After an incident in 2014 where J.R.R. became violent with Dr. Pepe, this case was reassigned

---

[5] Even in a complex case such as this one, it is unacceptable for the orphans' court to take a year to complete a TPR hearing. ***See In re T.S.M.***, 71 A.3d 251, 256 n.12 (Pa. 2013) ("An eight month delay between the filing of a termination petition and a hearing thereon, without some explanation is inconsistent with the best practices for dependent children in need of permanency.").

[6] The orphans' court also incorporated J.R.R.'s testimony from January 13, 2017.

to Dr. Neil Rosenblum, who conducted evaluations in 2014 and 2015. The case was then re-assigned back to Dr. Pepe. The orphans' court summarized their testimony.[7]

> Dr. Patricia Pepe who evaluated the family between 2011 and 2014, and again in 2016, opined that a lack of structure and "constant chaos" in the home resulted in the needs of [C]hildren not being met. Dr. Pepe reported that Mother was "extremely depressed, withdrawn, overwhelmed" and "in a state of hopelessness" and that Mother's own mental health problems caused her to "shut down." As a result, Mother was "not available to [C]hildren when they desperately needed her," failed to provide stimulation and nurture, and as a consequence [C]hildren have been neglected and suffered "extreme developmental delays." Dr. Pepe further opined that Mother failed to take responsibility for [C]hildren's problems, or comprehend what changes she would have to implement in order to improve her ability to parent. Dr. Pepe reported that Mother failed to follow through with specific recommendations from service providers to help [C]hildren improve their level of functioning, and that Mother displayed extreme emotional volatility. In addition, she noted a tendency by Mother to believe that both she and [C]hildren were "always sick" and reinforced that belief in her contact with [C]hildren and others, contributing to their continued problem behaviors and inability by Mother to appropriately address those behaviors.
>
> Even while noting that Mother and Father were cooperative with her during psychological evaluations, Dr. Pepe maintained that they were "completely ineffective in addressing [Children's] behaviors." However, in at least one evaluation in August 2013, Dr. Pepe reported "greater family cohesion" with Mother and Father "in control" and "[a]ll three [C]hildren exhibit[ing] multiple bonding behaviors towards their parents suggestive of a primary

---

[7] As this Court has explained, "a trial court has discretion to accept or reject a witness' testimony, including that of an expert witness, and is free to believe all, part, or none of the evidence presented." *In re Bosley*, 26 A.3d 1104, 1111 (Pa. Super. 2011) (citing *Childress v. Bogosian,* 12 A.3d 448, 456 (Pa. Super. 2011)).

attachment," indicating some positive efforts by Parents to manage their [C]hildren's needs. Subsequently, however, when Dr. Pepe again attempted to evaluate the family's progress in 2014, in the course of the meeting J.R.[R.] became agitated and aggressive, slapping Mother and pulling her hair. When Dr. Pepe attempted to intervene, J.R.[R.] punched her in the face resulting in J.R.[R.] being transported immediately for hospitalization at WPIC. Dr. Pepe thereafter declined to conduct further evaluations of the family, and did not evaluate the family again until 2016. Psychological evaluations in 2014 and 2015 were therefore conducted by Dr. Neil Rosenblum.

Based on her various psychological evaluations of the family, Dr. [] Pepe described Parents' relationship with [C]hildren as "pathological" and "toxic." While acknowledging that J.R.[R.] and A.R.[R.] suffer from significant developmental delays and behavioral and psychological problems, Dr. Pepe nevertheless attributed much of [C]hildren's below age-level behaviors to Parents['] failure to provide the necessary level of parenting supervision and structure to meet [Children's] physical, emotional, and mental health needs, in order for them to function appropriately. According to Dr. Pepe, [P]arents lack the capacity to control [C]hildren and to respond to them appropriately as parents, despite the resources they have received over the years to assist them with managing [C]hildren's needs.

Dr. Pepe testified that during psychological evaluations with J.R.[R.], he reported to her that [M]other and [F]ather fought a lot, expressed frustration with the chaos and conflict in the home, and although he did indicate a desire to live with [P]arents, he also stated contradictory desires to leave the home because [] it was not a calm environment, all [M]other did was put on movies, he did not have a clean house, and "Mom and Dad have to stop screaming."

With respect to A.R.[R.], Dr. Pepe opined that Parents' failure to provide her with the encouragement, opportunity and the parenting necessary to develop age appropriate skills has contributed to her developmental delays and problem behaviors. She noted that A.R.[R.] has tested in the above-average IQ range, and is "a very intelligent little girl [who] had the capacity to benefit from clearly defined expectations." Dr. Pepe did recognize however, that even outside of Parents' care, A.R.[R.] has continued to display problem behaviors.

Dr. Pepe opined that if [C]hildren were not given the opportunity to live in a supportive and positive home environment outside of parental care, they would not be able to function as adults. She testified that [P]arents have had an extremely negative impact on [C]hildren, and that future contact with them would be detrimental to all three children, emphasizing instances in which [C]hildren exhibited poor behaviors after interacting with Parents. Dr. Pepe opined that Parents' failure to internalize and effectuate positive change in their relationship with [C]hildren might be due to a lack of capacity given Parents' own psychological conditions such as Mother's "narcissistic" tendencies, leading her to become "self-absorbed" and "neglect" [C]hildren and [Father's] impulsivity and aggression. Although Dr. Pepe recognized that [C]hildren were attached to Parents and that a bond exists between them, she opined that the parental relationship is detrimental to [C]hildren.

Dr. Neil Rosenblum however, contradicted Dr. Pepe's conclusions that Parents were harmful to [C]hildren. Rather, at the TPR hearings Dr. Rosenblum testified he disagreed with Dr. Pepe's conclusion that the relationship between Parents and [C]hildren was "pathological" and "toxic," and stated that his view of the family differed from Dr. Pepe's. Dr. Rosenblum further testified that termination of parental rights would not necessarily serve the needs and welfare of [C]hildren.[5]

_____

[5] In 2016, Dr. Rosenblum declined to conduct further evaluations of the family, testifying at the TPR hearing that he felt his views as to the family were not consistent with the outcome CYF was seeking. Because of the difference of opinion in how he and CYF viewed the case, he declined to conduct any further psychological evaluations of the family. Dr. Pepe therefore resumed working with the family, and conducted final psychological evaluations of Parents and the three children in 2016.

In his Psychological Evaluation Report dated February 20, 2015, Dr. Rosenblum noted that "[t]his family continues to present as one of the most complex and challenged family units that I have ever evaluated" noting that "[a]ll three of the children … present with very concerning developmental impairments and mental health difficulties." Dr. Rosenblum expressed the view

that [C]hildren are "severely impaired developmentally [and] mentally" and that while "some of these concerns undoubtedly have been a manifestation of poor parenting and a dysfunctional home environment … on the other hand some of these manifestations and problems are clearly a function of genetics and biological impairments, which both parents evidence."

Although Dr. Rosenblum recognized that Mother and Father are "challenged in their ability to respond effectively and consistently to the needs of [C]hildren," he did not view their relationship with [C]hildren as totally unhealthy and toxic. He recognized that Parents were not able to stay consistently calm, and that Father evidenced a lack of impulse control. He additionally recognized that Mother had difficulty setting limits and utilizing parenting skills such as positive reinforcement in "real life situations." He opined that "her own mental health problems contribute" to that inability, such that she "cannot consistently or uniformly incorporate the types of desired behavioral characteristics of parents … that would be [optimal] for [C]hildren." Nevertheless, Dr. Rosenblum recognized a strong bond between Parents and [C]hildren, and observed that their relationship had important positive elements.

Dr. Rosenblum disagreed with Dr. Pepe's suggestions that [C]hildren's negative behaviors could be so heavily imputed to Parents. Rather, he testified that other circumstances and triggering factors, together with genetic and biological component[s] of [C]hildren's mental health disorders, may have played a role in [C]hildren's negative behaviors. For example, he noted that [C]hildren have difficulty with change and transition, and they did not fully understand why they did not live with Parents[,] which may have contributed to their outbursts. He reiterated that all three children are particularly challenging, each in their own right, that they suffer significant underlying mental health problems, and that they are prone to emotional volatility. He observed that although Parents have not been able to consistently manage [C]hildren's behavior, [C]hildren have also not consistently succeeded in many other foster homes and mental health facilities outside of Parents' care. He further noted a tendency by [C]hildren to fabricate or distort information and testified that A.R.[R.] in particular "lives in her own fantasy world at times[,]" which must be considered when assessing her allegations of sexual abuse and which make those allegations particularly difficult and challenging to address. He recognized

that although A.R.[R.] does "act out sexually," she in general "operates on a very primitive level" and that it had not been established with a high degree of accuracy that she has absolutely been sexually abused.

Dr. Rosenblum praised Parents for their "above and beyond" efforts to regularly and consistently visit with [C]hildren, and to stay informed about their various diagnoses and meet their intellectual needs, although he did acknowledge some limitations in Parents' capabilities. However, he emphasized that Parents' relationship with [C]hildren must be viewed in light of [C]hildren's severe developmental problems, and "overwhelming" special needs, not all of which could be attributed to poor parenting. He stated that in this particular instance, Parents "have been placed under a microscope more than many" and that while "they struggle at times … [t]hey are far from perfect parents [but] are dealing with a very challenging group of children" and they parent appropriately in some ways.

Accordingly, Dr. Rosenblum testified that he had considerable reservations about recommending termination, particularly without the identification of an adoptive home. Rather, Dr. Rosenblum opined that "[C]hildren love their parents," and that there is "considerable value and attachment and a positive connection" between [C]hildren and Parents. He stated that Parents "love their children [and while] there are some obviously unusual circumstances which prevent reunification and will most likely continue to do so … that doesn't mean that [C]hildren should be totally cut off from [the] relationship which [is] meaningful even if they are not at a point where we can achieve reunification."

Orphans' Court Opinion, 3/28/2018, at 14-20 (citations to notes of testimony omitted).

- 11 -

Based on the foregoing, on October 12, 2017, the orphans' court denied CYF's petitions as to J.R.R. and A.R.R. CYF timely filed notices of appeal, and both CYF and the orphans' court complied with Pa.R.A.P. 1925.[8]

On appeal, CYF claims the orphans' court erred in denying its petitions. We begin with our standard of review and the applicable law.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [subs]ection 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of

---

[8] It is not clear why that order was not entered on the docket until January 10, 2018; however, due to the delayed entry of this order, the notices of appeal filed on February 6, 2018, are timely.

- 12 -

the analysis pursuant to [subs]ection 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Initially, the orphans' court denied CYF's petitions pursuant to both subsections 2511(a) and (b). However, in its opinion, the orphans' court concedes that CYF satisfied subsection 2511(a) as to Children.[9] As our Supreme Court has explained, "[i]f the grounds for termination under subsection (a) are met, a court 'shall give primary consideration to the developmental, physical and emotional needs and welfare of the child' [as outlined in 23 Pa.C.S. § 2511(b)]." *T.S.M.,* 71 A.3d at 267. Thus, on appeal, CYF argues only that the orphans' court erred in concluding that it had not satisfied subsection 2511(b). That subsection provides as follows.

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings,

---

[9] With respect to J.R.R., the orphans' court concluded that "[d]espite the numerous resources that Parents have been provided, they have been unable to internalize and implement parenting strategies over time to provide J.R.[R.] with the consistent structure and reinforcement he requires." Orphans' Court Opinion, 3/28/2018, at 23. With respect to A.R.R., the orphans' court credited CYF's testimony that "over the course of time [] Parents have received various supporting services both in and out of parental care, and despite the efforts over many years to improve [the ability of Parents to parent A.R.R.,] they have failed to display significant improvement in their ability to provide her with parental care." *Id*. at 25.

income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

[Subs]ection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, [subs]ection 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)) (quotation marks and

citations omitted).

"When examining the effect upon a child of severing a bond, courts must

examine whether termination of parental rights will destroy a 'necessary and

beneficial relationship,' thereby causing a child to suffer 'extreme emotional

- 14 -

consequences.'" ***In re Adoption of J.N.M.***, 177 A.3d 937, 944 (Pa. Super. 2018) (citing ***In re E.M.***, 620 A.2d 481, 484–85 (Pa. 1993)). "In the case of an unhealthy bond, 'attention must be paid to the pain that inevitably results from breaking a child's bond to a biological parent, even if that bond is unhealthy, and we must weigh that injury against the damage that bond may cause if left intact.'" ***J.N.M.***, 177 A.3d at 944 (citing ***T.S.M.***, 71 A.3d at 267).

In its opinion, the orphans' court concluded that this case was analogous to ***In re E.M***, 908 A.2d 297 (Pa. Super. 2006). ***See*** Orphans' Court Opinion, 3/28/2018, at 23. Conversely, CYF argues that this case is akin to ***T.S.M.***, *supra*. CYF's Brief at 38. Thus, we examine both cases to provide background and context.

***E.M.*** involved brothers, R.M. and E.M. In 2003, when the boys were 12 and 11 years old respectively, the Lehigh County Office of Children and Youth Services (CYS) took emergency custody of them when their mother, P.F., was arrested for assaulting her 17-year-old stepson. Neither parent appeared at the dependency hearing, and R.M. and E.M. were adjudicated dependent. P.F. subsequently failed to comply with her family service plan by, *inter alia*, moving to Virginia without notifying CYS and attending only about half of the scheduled visits with R.M. and E.M.

P.F. continued failing to comply with her objectives; thus, on February 7, 2005, CYS filed petitions to terminate involuntarily P.F.'s parental rights. Hearings were held in October 2005, when R.M. was fifteen years old and E.M. was fourteen years old. At that time, they resided in the same foster home,

which was not a pre-adoptive placement; however, their foster mother was willing to keep them until the age of majority. Both R.M. and E.M. expressed a desire to return to P.F.

However, as the trial court pointed out, P.F. was residing in Mexico and had not visited the children since 2003. Moreover, her telephone contact was erratic, although they kept in touch via email. Based on the foregoing, the trial court granted the petitions filed by CYS. Both P.F. and E.M. appealed.

On appeal, this Court agreed with the trial court that CYS had satisfied its burden pursuant to subsection 2511(a). In analyzing subsection 2511(b), and considering whether termination would best serve the children's needs and welfare, this Court offered the following, in relevant part.

> In analyzing this case, we must remain cognizant of our deferential standard of review—we must determine whether the decision is supported by competent evidence and, absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Although competent evidence of record supports the court's findings that severing the bond between mother and children will not harm the children, given the unique circumstances of this case, we find the court abused its discretion in finding that termination serves the needs and welfare of the children.

> If an adoptive placement were already identified for these children, our decision likely would be different. As this case has been pending, however, the children have continued to age. No adoptive placement has yet been identified for the children, and the reality is, it is not likely an adoptive family will be found at this late stage of their childhood. Although testimony indicates termination of parental rights will eliminate their false hope that they will reunite with [P.F.], R.M. seems to accept this reality already. In addition, termination may very well create a new false hope—that they will be adopted at this late stage of their childhood.

Further, the children need to consent to adoption at this point. Testimony indicates that R.M. is farther along in "the process" than E.M. This is evident particularly given the fact that R.M. did not appeal, but E.M. has. It would not benefit these children to separate them if one is willing to consent to adoption and the other is not. In his appellate brief, E.M. specifically emphasizes his consent to adoption is required. We note there have been two constants in the children's lives since they have been in placement, their foster home in which they are very comfortable, and their relationship with each other. Both therapists agree there is a very strong bond between the children, and E.M.'s therapist felt it was very important for the children to remain together.

… [Children] can also reunite with [P.F.] in the not too distant future, when they are eighteen and age out of the system.

In sum, we are resigned to agree with [P.F.]—nothing will change whether [P.F.'s] rights are terminated or not, and the only thing that will be accomplished by termination is that the children will be true orphans. We further agree the children currently have permanency to the fullest extent possible under the circumstances.

*E.M.*, 908 A.2d at 309 (internal citations and quotation marks omitted).

Accordingly, this Court reversed the orders of the trial court under these circumstances. We now turn to our Supreme Court's decision in *T.S.M.*

T.M. was the natural mother of seven children. The Allegheny County Office of Children, Youth and Family (CYF) became involved with the family in 2001, and the oldest four children (the younger children had not yet been born) were removed from T.M.'s care and placed with their maternal grandmother. "The removal followed a life threatening injury to then-six month old Tai.M., requiring emergency neurosurgery…. By August 2003, the children were reunited with [T.M.], and the case seemingly closed." *T.S.M.*,

71 A.3d at 253-54. In 2006, after two more children were born, there were suspicious injuries to those two children. All six children were removed from T.M.'s care on July 19, 2006, and placed with maternal grandparents. Tae.M. was born in November 2006 and placed in a foster home upon discharge from the hospital. "By the summer of 2007, the six children in maternal grandmother's custody were removed and placed in foster homes. The oldest child, daughter Tad.M., then eight years old, was returned to Mother's care prior to November 2007, while the other six remained in foster care." *Id*. at 254.

Children were moved in and out of foster care, T.M.'s care, and group homes over the next several years. The children disclosed that when they were in T.M.'s care, she "whoops them with belts and hangers, smokes weed and [they] had witnessed [T.M.] and paramour having sexual relations." *Id*. at 254. In addition, T.M. "failed or refused to obtain necessary education, medical, and mental health care for [the children], which was especially concerning given that several of them suffered from mental health disorders." *Id*. at 255. In addition, T.M. continued using drugs, and T.M.'s paramour was being investigated for sexually abusing Tad.M.

In August 2010, CYF filed petitions to terminate T.M.'s parental rights to all seven children. Hearings on the petitions began in April 2011 and concluded in November 2011. The orphans' court denied the petitions in January 2012. Specifically, the orphans' court found that CYF had established

grounds under subsection 2511(a), but concluded that termination did not serve the needs and welfare of the children pursuant to subsection 2511(b).

At issue was the nature of the bond between T.M. and the children, which Dr. Pepe characterized as pathological and unhealthy. Specifically, Dr. Pepe "observed in her testimony [that children are conflicted] between loyalty to a biological parent and loyalty to a foster parent, pre-adoptive parent, adoptive parent." *Id*. at 270 (quotation marks omitted).

In declining to terminate T.M.'s parental rights, the trial court specifically "minimized Dr. Pepe's assertion that the bonds [between T.M. and the children] in this case were pathological…." *Id*. at 260. "It concluded that the children's bonds to [T.M.] and each other counseled in favor of not terminating parental rights and instead for providing open adoptions or subsidized permanent legal custody." *Id*.

The children's guardian *ad litem* (GAL) appealed. On appeal, this Court, in a divided opinion, affirmed the orders of the orphans' court, and the GAL sought allowance of appeal which was granted by our Supreme Court.[10] Our Supreme Court offered the following, in relevant part.

> [C]ontradictory considerations exist as to whether termination will benefit the needs and welfare of a child who has a strong but unhealthy bond to his biological parent, especially considering the existence or lack thereof of bonds to a pre-adoptive family. As with dependency determinations, we emphasize that the law regarding termination of parental rights

---

[10] By this point, the GAL was appealing only the orders as to the five youngest children. The older two children were over the age of 12.

should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved.  Obviously, attention must be paid to the pain that inevitably results from breaking a child's bond to a biological parent, even if that bond is unhealthy, and we must weigh that injury against the damage that bond may cause if left intact. Similarly, while termination of parental rights generally should not be granted unless adoptive parents are waiting to take a child into a safe and loving home, termination may be necessary for the child's needs and welfare in cases where the child's parental bond is impeding the search and placement with a permanent adoptive home.

In weighing the difficult factors discussed above, courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail, as we have in this case, the result, all too often, is catastrophically maladjusted children. In recognition of this reality, over the past fifteen years, a substantial shift has occurred in our society's approach to dependent children, requiring vigilance to the need to expedite children's placement in permanent, safe, stable, and loving homes. ASFA[11] was enacted to combat the problem of foster care drift, where children, like the children in this case, are shuttled from one foster home to another, waiting for their parents to demonstrate their ability to care for the children. This drift was the unfortunate byproduct of the system's focus on reuniting children with their biological parents, even in situations where it was clear that the parents would be unable to parent in any reasonable period of time. Following ASFA, Pennsylvania adopted a dual focus of reunification and adoption, with the goal of finding permanency for children in less than two years, absent compelling reasons.

\*\*\*

In this case, the children have unhealthy bonds to [T.M.], who is seemingly the root of their manifold psychological and behavioral conditions.  Moreover, [T.M.] appears to be interfering with the children's bonding to their foster families, resulting in

---

[11] Adoption and Safe Families Act, 42 U.S.C. § 671 *et seq*.

- 20 -

confusion for the children and further delay in permanency for the children.

***

In relying upon the mere existence of the bond between [T.M.] and the children, the trial court failed to recognize the substantial, possibly permanent, damage done to these children by the prolonged, unhealthy, pathological bond with [T.M.], especially as it affected the children's ability to form attachments to foster families who could have provided the necessary love, care and stability that these children have so needed for the past decade. We conclude without hesitation that it best serves their needs and welfare to sever their bond with [T.M.] permanently, in order to permit them to be placed forthwith into healthy, permanent homes.

*In re T.S.M.*, 71 A.3d at 268-71 (internal citations omitted).

Based on the foregoing, our Supreme Court reversed the orders of this Court and the orphans' court. With this backdrop in mind, we turn to analysis of subsection 2511(b) as it relates to J.R.R. and A.R.R.

### J.R.R.'s Needs and Welfare

With respect to J.R.R., the orphans' court offered the following in reaching its conclusion that termination would not serve J.R.R.'s best interests:

[A]t the time of the TPR hearings, J.R.[R.] was fifteen years of age and stated a preference not to have [P]arents' rights terminated. Although J.R.[R.] was residing in a suitable foster home identified as a long-term placement, his foster mother expressed no intent to adopt him, and no other adoptive home had been identified. Given J.R.[R.]'s age, he would be required to consent to adoption but has stated a preference to have Parents retain their rights. It is therefore questionable whether J.R.[R.] would even consent to adoption, if the opportunity arose. Moreover, at the age of fifteen, and as J.R.[R.] continues to age, the likelihood of adoption continues to diminish and J.R.[R.] can reunite with Parents when he reaches the age of majority. J.R.[R.] continues to visit with

- 21 -

Parents, and without any negative effect. Under these particular circumstances, termination would have little to no effect on his circumstances, and the only thing it would accomplish would be to make J.R.[R.] a true orphan. This [c]ourt conclude[s] therefore that termination of parental rights would not serve his needs and welfare.

Orphans' Court Opinion, 3/28/2018, at 25 (citations omitted).

Instantly, J.R.R. will be sixteen years old in August of 2018; thus, as correctly pointed out by the orphans' court, it is necessary that he consent to adoption. **See** 23 Pa.C.S. § 2711(a)(1) ("[C]onsent to adoption shall be required of … [t]he adoptee, if over 12 years of age."). However, according to his CYF caseworker, Wanda Beasley, J.R.R. has "always state[d] that he would like to go home." N.T., 9/25/2017, at 61. Moreover, J.R.R. testified to that desire as well: "I want to keep my mom and dad's rights. I want them to keep their medical rights and guardian rights. I want to have more contact with them, more visits, including home visits. I want to move back home. I want my family to work as a team." N.T., 1/13/2017, at 32.

Furthermore, although J.R.R. is doing well in his current foster home, it is a long-term placement, not a pre-adoptive home, and CYF has not identified a pre-adoptive home for J.R.R. **See** N.T., 9/14/2017, at 108-109; N.T., 9/25/2017, at 64. Moreover, Dr. Rosenblum testified that "there is certainly evidence of positive dimension of interaction between [C]hildren and [P]arents." N.T., 10/12/2017, at 11. He opined further that he does "believe [] quite strongly that there is a positive bond and attachment." **Id**.

CYF points out that "having an adoptive home is not a prerequisite to the termination of parental rights." CYF's Brief at 39. That is a correct

statement of the law. ***See*** 23 Pa.C.S. § 2512(b) ("If the petitioner is an agency it shall not be required to aver that an adoption is presently contemplated nor that a person with a present intention to adopt exists.").

However, as our Supreme Court has stated, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." ***T.S.M.***, 71 A.3d at 268. In addition, the well-regarded Pennsylvania Dependency Benchbook provides that "[w]hile having an identified adoptive resource is not a prerequisite for [termination of parental rights], ideally there should be a strong likelihood of eventual adoption." Administrative Office of Pennsylvania Courts Office of Children and Families in the Courts, Pennsylvania Dependency Benchbook § 12.1 at 126 (2010).

Based on the foregoing, we conclude the orphans' court's findings are supported by the record, and it did not err or abuse its discretion in denying CYF's petition as to J.R.R. J.R.R. may never return to the care of his parents, but we see no advantage in making J.R.R. an orphan. Dr. Rosenblum testified that J.R.R. derived benefit from his bond with Parents. Further, even if the bond between J.R.R. and Parents were pathological or toxic as Dr. Pepe suggests,[12] we agree with the orphans' court that the bond

---

[12] We also point out that Dr. Pepe testified that between seeing J.R.R. in 2013 and evaluating him again in 2016, J.R.R. had made "significant progress," and she was "impressed with his maturity and growth." N.T., 9/14/2017, at 48. During this time, J.R.R. had regular contact with Parents.

is not what is keeping J.R.R. from finding permanency. Instead, it is his age and the fact that he does not wish to be adopted that make termination of parental rights not in his best interests. *See In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) ("[E]ven where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.").

Based on the foregoing, we agree with the orphans' court that this situation is more analogous to *E.M.* than *T.S.M.*[13] Accordingly, we affirm the order of the orphans' court as to J.R.R.

## *A.R.R.'s Needs and Welfare*

With respect to A.R.R., the orphans' court offered the following in reaching its conclusion that termination of parental rights is not in her best interests at this juncture.

> A.R.[R.] continues to suffer from significant developmental and mental health problems. She continues to display aggressive and volatile behaviors, even in a specialized setting with providers trained to manage her condition. This [c]ourt additionally noted that in her current placement, other than her bi-weekly visits with Parents, which A.R.[R.] enjoys and which are going well, outside

---

[13] As pointed out *supra*, in *T.S.M.*, the GAL was not seeking reversal for the oldest two children, who were ages fourteen and thirteen at the time of the Supreme Court decision.

of school A.R.[R.] has little to no contact with other children, friends or family. Her only other regular personal contact is with her paid caregivers. Although CYF [] identified a "possible" pre[-] adoptive home a few days before the TPR hearing, CYF had not taken further steps towards securing or placing A.R.[R.] in such a home. Although discharge locations for A.R.[R.] had been identified for consideration, none had been selected or pursued with any certainty at the time of the TPR hearings. Moreover, testimony elicited at the TPR hearing indicated that A.R.[R.] was not ready for discharge, and still required institutional care. Furthermore, even if such an adoptive home [were] available, any potential caregiver would require significant training in order to be able to support A.R.[R.] and manage her needs.

… A.R.[R.] continues to have complex medical and psychological needs that preclude her from leaving therapeutic care at the RESPOND facility and being placed in a foster home family setting, or pre-adoptive home. At the time of the TPR hearings, A.R.[R.] was not ready to be discharged, and the possibility of a discharge date remained indefinite, particularly in light of A.R.[R.] having experienced a recent regression.[14] Thus, it appears that A.R.[R.] would continue to reside at RESPOND for the immediately foreseeable future, although RESPOND maintains a goal of, and continues to work towards discharge. While at treatment at RESPOND other than the regular interaction of her paid caregivers, outside of school A.R.[R.] appears to live in relative isolation in which her only significant contact other than her staff and occasional interactions with residents, is her visits with Parents.

Given the evidence presented indicat[ing] a lack of foreseeable date for her discharge from RESPOND, termination of

_____

[14] Dr. Hode testified that this regression was attributable to two factors. First, A.R.R. reported being sad about a change in staff. Second, A.R.R. was attending a Court Appointed Special Advocates (CASA) event where "a peer had informed her that [J.R.R.] was moving into foster care and she wouldn't see her brother anymore." N.T., 9/14/2017, at 85-86. We note that in other parts of the record, Dr. Hode states that A.R.R. regressed because she learned that J.R.R. would not "be" her brother anymore. *Id*. at 96. In addition, Tamryn Brown, A.R.R.'s therapist, testified that A.R.R. learned through a peer that J.R.R. "was moved to another place and [A.R.R.] felt that [J.R.R.] didn't want [A.R.R.] to be his sister anymore." N.T., 9/25/2017, at 20.

parental rights at this time would have no effect on A.R.[R.]'s circumstances but to render her a true orphan. A.R.[R.] would continue to reside at RESPOND, under the same circumstances, but would be deprived even of the limited supervised visitation she receives with her [P]arents, and which she reportedly enjoys.

Orphans' Court Opinion, 3/28/2017, at 26-27 (citations omitted).

Here, at the time of the hearings, A.R.R. was 10 years old. Thus, unlike her brother, her consent to adoption is not a pre-requisite. However, like her brother, she is not in a pre-adoptive home. Moreover, it is unclear when, if ever, she will be in a pre-adoptive home. Leann Rendulic, a CYF caseworker, testified that as of September 14, 2017, she is "looking into an adoptive home for [A.R.R.]." N.T., 9/14/2017, at 111. However, Rendulic acknowledged that A.R.R. is not ready to leave RESPOND. In fact, A.R.R. still has a 2-to-1 staff-to-patient ratio during the day, and there are several steps between that and a pre-adoptive foster home. According to Dr. Hode, A.R.R. would need to do well for two to three months with a 1-to-1 staff-to-patient ratio. *Id*. at 99. Moreover, prior to discharge, a foster home would need to be identified and trained for A.R.R.'s needs. *Id*. at 99-100.

Tamryn Brown, A.R.R.'s therapist since January of 2016, testified that A.R.R. had "made a lot of progress" since she began treating her, particularly between March and September of 2017, at the time of the testimony. With respect to visits with Parents, Brown testified that A.R.R. has said that the visits are "good." N.T., 9/25/2017, at 21. In addition, Beasley also testified that these visits are going "well" and that A.R.R.'s behavior afterwards is "positive." *Id*. at 68.

- 26 -

Thus, with respect to A.R.R., the record supports the conclusions reached by the orphans' court. Despite the fact that A.R.R. is younger than her brother, she is not in a pre-adoptive home. A.R.R. is not being prevented from bonding with her foster family or pre-adoptive family because of her bond with Parents; rather, she still requires significant therapeutic intervention before she reaches that stage. Moreover, her visits with Parents have been characterized as going well. Thus, the concerns exhibited by our Supreme Court in **T.S.M.** are not present here. It simply does not make sense to terminate Parents' parental rights under these circumstances.

Of course, A.R.R.'s situation is bound to change; she cannot stay at RESPOND forever. However, at the time of the termination hearings, there was not a likelihood of eventual adoption, and Dr. Rosenblum testified that maintaining contact between Parents and Children while they were not in a pre-adoptive home was beneficial to them. **See** N.T., 10/12/2017, at 24. He further testified that A.R.R. "knows her family, she knows her parents, she loves her brothers, she loves her grandmother, she has had contact with … an aunt." **Id**. at 30. Although Dr. Pepe disagreed with that conclusion, it was up to the trial court to assess the credibility of these expert witnesses. As this Court has explained, "a trial court has discretion to accept or reject a witness' testimony, including that of an expert witness, and is free to believe all, part, or none of the evidence presented." **In re Bosley**, 26 A.3d 1104, 1111 (Pa. Super. 2011) (citing **Childress v. Bogosian,** 12 A.3d 448, 456 (Pa. Super. 2011)). Thus, we will not disturb this finding.

In fact, the evidence demonstrates that severing this bond could cause A.R.R. to regress further, as demonstrated by her recent regression upon learning about J.R.R.'s status. *See J.N.M.*, 177 A.3d at 944 (citing *T.S.M.*, 71 A.3d at 267) ("In the case of an unhealthy bond, 'attention must be paid to the pain that inevitably results from breaking a child's bond to a biological parent, even if that bond is unhealthy, and we must weigh that injury against the damage that bond may cause if left intact.'").

In considering the arguments set forth by CYF, we bear in mind that

> there are clear reasons for applying an abuse of discretion standard of review in these cases. We observe[] that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*S.P.*, 47 A.3d at 826-27 (internal citation omitted).

Thus, we conclude that the orphans' court did not abuse its discretion in concluding that it is not in A.R.R.'s best interests to sever attachment with her current family at this time. Thus, the orphans' court did not err in denying CYF's petition as to A.R.R.

Based on the foregoing, we affirm the orders of the orphans' court.

Orders affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/16/2018